
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2016

**HAROLD BERNARD SCHAFFER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Dyer County**
**No. C06-299    R. Lee Moore, Jr., Judge**

———————————

**No. W2016-00115-CCA-R3-PC**

———————————

The Petitioner, Harold Bernard Schaffer, appeals from the Dyer County Circuit Court's denial of his petition for post-conviction relief from his conviction for first degree felony murder, for which he is serving a life sentence. The Petitioner contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel claims. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Lanier, District Public Defender, and Sean P. Day, Assistant Public Defender, for the appellant, Harold Bernard Schaffer.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's conviction relates to the 1985 murder of William Pierce, Jr. The victim was found inside his business with his throat cut. His wallet and a large quantity of cash were missing. The police collected a number of blood samples, and a sample not belonging to the victim was entered into the Combined DNA Index System (CODIS). In 2005, the unidentified sample was matched with the Defendant's DNA profile. The Defendant was convicted of first degree felony murder and sentenced to life imprisonment. In the appeal of the conviction, this court summarized the evidence as follows:

[T]he proof in this case is not overwhelming. However, under our standard of review, we hold that it is sufficient to establish the Defendant as the perpetrator of the felony murder of the victim. Dr. Smith testified that the victim had been killed by the infliction of stab and incised wounds. He opined that a carpet knife could have been the weapon. The victim had suffered cuts and abrasions to his hands, leading to the reasonable inference that the victim had put up a struggle. It is also reasonable to infer that an attacker who is wielding a knife may himself suffer bleeding wounds when his victim responds with physical resistance. Blood recovered from the crime scene on the day of the crime was determined by DNA analysis to belong to someone other than the victim. Eventually, a DNA match was found in CODIS, indicating that the Defendant was the source of the blood. DNA analysis of a known standard subsequently obtained from the Defendant placed the Defendant at the scene of the crime. The blood sample generating the match was found behind the counter of the store, between the victim and the cash register. Blood on keys found on the cash register also was subjected to DNA analysis. The analysis indicated that the Defendant could not be excluded as one of the contributors of the blood found on the keys. The reasonable inference is that, after killing the victim and thereby sustaining bleeding wounds, the perpetrator sought access to the contents of the cash register. By doing so, the perpetrator had the opportunity to leave his own blood in the area near the cash register, including on the floor behind the counter on which the cash register sat and the cash register keys were found. In 1985, Van Sant was able to obtain enzymes and proteins from the blood sample collected from behind the counter. His testimony that the enzymes and proteins contained in blood break down when exposed to the environment supports the inference that the blood behind the counter was fresh when it was collected at the crime scene.

*State v. Harold Bernard Schaffer*, No. W2010-01854-CCA-R3-CD, 2012 WL 3792034, at *13 (Tenn. Crim. App. Aug. 30, 2012), *perm. app. denied* (Tenn. Feb. 12, 2013).

The Petitioner filed the present post-conviction petition and, as relevant to this appeal, alleged that trial counsel had provided ineffective assistance by (1) failing to attack the validity of the indictment on the proper basis, (2) failing to challenge the search warrant used to obtain the Petitioner's DNA, (3) failing to re-test a DNA sample, (4) failing to investigate alibi witnesses, (5) failing to develop an effective theory of the case, (6) delivering an inflammatory opening statement, (7) failing to object to a fingerprint evidence jury instruction, and (8) stipulating to evidence without the Petitioner's permission.

We confine our review of the post-conviction hearing to the testimony relevant to the issues raised on appeal. At the hearing, trial counsel testified that the proof in the Petitioner's trial revolved around DNA evidence. Counsel identified a Sorenson Laboratories form relative to the submission of a DNA sample for testing and said that Dr. William Watson, the defense's DNA expert, completed the form. Counsel said that the laboratory identified human DNA and that the sample was "so degraded that it was useless as far as any kind of identification."

The Sorenson Laboratories DNA sample submission form and the laboratory report were received as exhibits and reflected that the "Pro/Co" test was requested and performed on the sample. The laboratory report reflected that although the sample was degraded, it contained male DNA.

Trial counsel testified that he subpoenaed Sorenson Laboratories' forensic chemist, Scott Walton, and that Mr. Walton testified about the degraded DNA sample at the suppression hearing. Counsel said that his argument centered on identifying the person responsible for the degradation of the sample between the Tennessee Bureau of Investigation's (TBI) analysis and Sorenson Laboratories' analysis. Counsel did not remember how he investigated the chain of custody or the sample's storage conditions but said that he "would have talked perhaps to the TBI people." Counsel stated that the TBI told him the sample had been stored according to protocol and that it should not have degraded. Counsel did not remember whether he asked Dr. Watson to investigate or question the TBI.

Trial counsel testified that until the prosecutor mentioned a more sensitive DNA test at a pretrial hearing, he was not aware it existed. Counsel said that it never occurred to him to ask Sorenson Laboratories which test they would use and that "they wouldn't at least use the same test, if not a more sensitive one." Counsel stated that he did not know what Dr. Watson was thinking, that the testing was a waste of time, and that he could not "conceive of an expert . . . using a less sensitive test[.]" Counsel said that he and Dr. Watson did not discuss the test Dr. Watson requested because it made no sense for Dr. Watson to request a less-sensitive test. Counsel stated that the witness from Sorenson Laboratories testified that Dr. Watson requested the less-sensitive test, that counsel was "flabbergasted" by the decision, and that Dr. Watson had no explanation. Counsel did not remember why he requested funding to retest the sample. Counsel stated that at the time of the post-conviction hearing, a portion of a sample had not been tested. Counsel said that Dr. Watson may have suggested retesting in order to obtain usable results and to check the accuracy of the State's test results. Counsel stated that he filed an ex parte motion to obtain funding for retesting and identified a July 24, 2009 order granting the motion.

The ex parte motion for funds to retest the DNA sample, the order granting the motion, and a letter from trial counsel to the trial court requesting an order to permit the TBI to send the sample to the outside laboratory were received as exhibits.

Trial counsel testified that he did not send the DNA sample to be retested because Dr. Watson suggested there was "a substantial possibility" more sensitive testing would identify the Petitioner's DNA. Counsel said that the degraded sample "was far more valuable to me as evidence than trying to see . . . if the State's test was correct" and that the State's test result was "probably correct." Counsel acknowledged that because the order was ex parte, he was under no duty to disclose the results of a repeated test to the State. Counsel noted that the State would have known about the retesting because the TBI had to authorize sending the sample. He said that he thought presenting an argument at the trial relative to the degraded DNA sample would have been unethical if he had another test result identifying the Petitioner's blood. Counsel noted that if the prosecutor had discovered the test results, the prosecutor could have subpoenaed the expert who tested the sample. Counsel said that he decided not to pursue further testing based upon Dr. Watson's advice.

A March 12, 2010 letter from trial counsel to the Petitioner was received as an exhibit. Counsel stated in the letter that he and the Petitioner had discussed the decision not to retest the DNA sample, that the Petitioner did not object to the decision, that the results of retesting could have been damaging to the Petitioner's case, and that the State's current DNA results were "of little value."

Trial counsel identified a November 30, 2009 motion to suppress the DNA evidence. Counsel said that the prosecutor failed to provide discovery related to the DNA test and that the motion discussed the inconclusive Sorenson Laboratories test results, the Tennessee Supreme Court's delay in approving funds for retesting, and the Petitioner's decision not to retest the sample in order to proceed to trial. Counsel did not remember whether the Petitioner's insisting on a speedy trial, rather than Dr. Watson's concerns, was the reason counsel did not have the sample retested. Trial counsel did not remember to what Dr. Watson referred when he testified at a pretrial hearing that the defense team decided "another outside independent laboratory would be a better approach."

Trial counsel recalled that a set of keys was collected at the crime scene, but he did not remember whether the State indicated that it intended to use the keys at the trial. Counsel said that blood was present on the keys and that the Petitioner could not be excluded as the contributor, that the test result was "meaningless," and that although he did not remember whether he considered independent testing of the DNA sample from the keys, he was unsure why he would have because the sample had no evidentiary value. Counsel said that he recalled the prosecutor's stating that he intended to use the keys at the trial and that he decided not to challenge the evidence because "it was more valuable

-4-

to argue to the jury that the State is so desperate . . . that they're presenting evidence which has virtually no evidentiary value[.]"

Trial counsel identified a September 6, 2007 motion to suppress the evidence resulting from the DNA test performed on the Petitioner. Counsel said that a nurse took a blood sample from the Defendant in prison and that the basis for the motion to suppress was a defect in the search warrant's affidavit. Counsel could not remember investigating whether the search warrant was ever filed or returned to the trial court. Counsel said that the Petitioner "made a big issue about everything" but that he could not remember whether the Petitioner was concerned about the search warrant's affidavit.

The motion to suppress was received as an exhibit. It alleged that false statements recklessly made and essential to establishing probable cause were present in the search warrant affidavit used to procure the Petitioner's DNA sample. The motion argued that the stated location at the crime scene of the drop of blood was essential to probable cause because the sample described in the affidavit was closer to the victim's body than the actual sample at issue.

Trial counsel did not remember from which court the search warrant was issued. Counsel agreed that he did not challenge the jurisdiction of the issuing court. Counsel said that he did not check to see if the search warrant "made it up here to the trial court." Counsel did not remember the Petitioner's asking counsel to determine whether the search warrant had been filed with the court clerk and said that if counsel considered the issue, he decided it would be insufficient to suppress the evidence. Counsel noted that if the issue were sufficient to suppress the evidence and he did not raise it, "that would seem to be ineffective assistance." Counsel agreed that Tennessee Rule of Criminal Procedure 41 required the return and filing of search warrants, but he did not know whether a violation of Rule 41 resulted in the suppression of evidence. Counsel commented that the reason he did not raise the issue was probably because the State "would just go get another sample . . . and analyze that and match it. I mean, . . . of what benefit would it be, really, seriously?" Counsel agreed that in the motion to suppress, he raised the discrepancy between the sample described in the search warrant affidavit and the one that matched the Petitioner's DNA. He also agreed that the blood sample described in the search warrant affidavit had less probative value and did not establish probable cause because it did not match the Petitioner.

The State addressed the post-conviction court and stipulated to the fact that the filing of the search warrant affidavit was not raised in the motion to suppress and that "[t]here was a lack of sufficiency of the affidavit." The State also stipulated that the suppression issue was not raised in the original or amended motion for a new trial and noted that the Court of Criminal Appeals addressed the issue in the appeal of the Petitioner's conviction.

-5-

A copy of the search warrant used to obtain the Petitioner's DNA and the supporting affidavit were received as an exhibit. The affidavit stated the following:

1. On or about May 17, 1985, a criminal investigation into the homicide death of William Pierce was begun.

2. When the crime scene was processed, a bodily fluid sample was recovered from the victim's left foot.

3. Forensic testing revealed that the bodily fluid sample did not belong to the victim.

4. [DNA] was isolated from the sample and subsequently entered into [CODIS].

5. [The Petitioner's DNA had also been entered into CODIS].

. . . .

8. The DNA, isolated from the bodily fluid sample found on the victim's left foot, was matched to a known standard from [the Petitioner].

9. To confirm the match, a known blood standard must be obtained and submitted for DNA testing.

The January 2008 suppression hearing transcript was received as an exhibit. At the hearing, TBI Agent Nathan Bishop testified that he wrote the affidavit while reading the case file and that he inadvertently mixed up the samples. TBI Agent Chad Johnson testified that testing the other half of a sample in order to confirm the TBI's result would have been useful. Trial counsel requested funding for an investigator and stated that the Petitioner's family had belatedly approached him with possible alibi information.

The trial court's order denying the motion to suppress was received as an exhibit. The court found no evidence of recklessness by Agent Bishop and that the samples had equal value in establishing probable cause because both indicated the Petitioner was present at the crime scene. The court noted that the location of the drop of blood in the room was not material to a probable cause determination.

Trial counsel testified that any error in the search warrant was not "something that would need to be in the motion for new trial anyway, because it wasn't a trial error." Counsel said that he did a lot of appellate work and that he knew if an error "happened at trial" but was not raised in the motion for a new trial, it was waived.

Trial counsel testified that if he did not renew a viable objection at the trial and that as a result, the issue was waived on appeal, "that could be a good issue" for post-conviction purposes. Counsel read from the Court of Criminal Appeals opinion that the suppression issue had been waived because it was not raised in the motion for a new trial. When asked whether counsel was familiar with the relevant procedural rule, counsel responded, "Apparently not." Counsel said that the trial court clerk did not possess the search warrant or supporting affidavit and that it was possible the documents were lost, rather than never filed. Counsel did not remember whether he attached the search warrant and affidavit to the motion to suppress but acknowledged that if they did not appear in the record, he did not. Counsel stated that trial court clerks in small counties reportedly "dumped all the papers" from a trial record into a box to send to the appellate court clerk and that counsel had a previous issue with this trial court clerk regarding documents not being contained in the appellate record, including motions, responses, and orders. When asked whether he took steps to ensure the search warrant and supporting documentation were included in the record, counsel said, "I would think that I had asked that the record be supplemented with it, and they said they didn't have it. But, I mean, maybe not."

Letters from the Petitioner to trial counsel were received as exhibits and reflected the Petitioner's request for counsel to preserve the search warrant affidavit issue for the appeal. The Petitioner also expressed in the letters that he believed the location of the DNA sample at the crime scene was important to the probable cause determination. The Petitioner noted that the affidavit listed a non-existent piece of evidence because the affidavit described blood on the victim's foot, whereas the actual sample was taken from the floor near the victim's foot. The Petitioner stated that counsel had told him the suppression issue could not be raised again until the appeal.

Written stipulations entered at the trial were received as an exhibit. The parties had stipulated to the admissibility of several pieces of evidence, including the DNA samples taken from the victim and the Petitioner, DNA sample 9A from the crime scene, the keys, the autopsy report, and crime scene photographs. The stipulations had signature lines for the trial court, trial counsel, and the prosecutor.

Trial counsel did not remember agreeing with the State to stipulate the admissibility of certain evidence at the trial but said that if the State wrote a letter to counsel's investigator with the stipulation enclosed, he believed the letter was accurate. Counsel stated that often, if a fact or piece of evidence did not affect the chosen defense, it was beneficial to "move things along" by stipulating to it.

Trial counsel identified a January 9, 2007 motion to dismiss the indictment, which alleged that the State had not included all elements of felony murder in the indictment. Counsel said that the challenge was relative to the version of the statute in the indictment, although he did not remember the defect in the indictment. Counsel stated that he did not

pursue the issue on appeal because he did not believe it benefitted the Petitioner. Counsel noted that in an appeal, he generally focused on issues that "actually help my client" rather than raising every possible issue.

The indictment, the January 9, 2007 motion to dismiss, and a January 4, 2008 hearing transcript were received as exhibits. The motion to dismiss alleged that the indictment was defective because it did not allege a mental state. At the hearing, counsel submitted the written motion without argument.

Letters from the Petitioner to trial counsel were received as exhibits and reflected the Petitioner's desire to attack the indictment because of its citation to a non-existent statute in 1985. In the letters, the Petitioner also discussed the difference between how mental states were codified in 1985 as compared to later statutes. In a letter written after the denial of the motion to dismiss, the Petitioner expressed frustration that counsel challenged the lack of a mental state and not the misstated Code section. The Petitioner requested that counsel file an interlocutory appeal.

When asked whether he researched the State's citation to a post-1989 statute for a pre-1989 offense, trial counsel testified that he employed a highly qualified legal research and writing assistant for this case and that counsel did not research the issue personally. Upon review of a hearing transcript, counsel remembered that he submitted a motion to dismiss the indictment based on a written motion and without argument. He noted that no reason existed to argue a motion if the entire argument was contained in the written motion.

Trial counsel testified that the Petitioner sent him letters during the proceedings and that he had received "far more letters from other clients." Counsel said that he read all of the letters. Counsel did not recall a September 20, 2006 letter from the Petitioner in which the Petitioner "was adamant that you argue vigorously the indictment question[.]" Counsel read a passage from the letter in which the Petitioner asked counsel to review the language in the Tennessee Code Annotated 1982 replacement volume to assess whether an issue existed with the indictment and if so, to attack the indictment. The Petitioner also requested a copy of the Code section at issue. Counsel did not recall a July 26, 2009 letter in which the Petitioner addressed the same issue.

Trial counsel testified that the Petitioner recalled having been in multiple locations during the time of the murder, that counsel followed up with former employers and attempted to obtain employment records, and that counsel was unsuccessful in developing an alibi defense. Counsel said that he did all he could to investigate an alibi defense.

An October 20, 2006 letter from trial counsel to the Petitioner was received as an exhibit and reflected counsel's asking the Petitioner to send him any alibi information he

could remember. Counsel stated that the DNA evidence was critical in the absence of an alibi.

Relative to the DNA evidence, trial counsel testified that he and Dr. Watson went to the TBI laboratory and storage facility, examined every piece of evidence, and spoke to several TBI employees. Counsel said that he attempted to find out why the sample sent to Sorenson Laboratories was degraded, that he spoke to the people in charge of the storage facility, and that "there's really no way to say for sure" how the sample became degraded.

Trial counsel testified that the State elicited trial testimony about other people who had been suspects. When asked whether he attempted to cast suspicion on anyone other than the Petitioner, counsel said that the State went into sufficient detail about the other suspects and that counsel did not want to detract from the effect of the States' witnesses saying several investigators wanted to drop the case because they believed the perpetrator was a woman who had moved out of the state and subsequently died.

Trial counsel testified that the DNA match was critical to the State's case, that they identified the DNA sample as the Petitioner's "to a probability on the population of the earth," and that the only remaining question was whether the Petitioner killed the victim, rather than attempting to rob him. Counsel said that the defense theory was that the evidence was insufficient to prove the Petitioner was present and that any other theory involved admitting the Petitioner was there, which would have undermined the primary defense.

Trial counsel identified an email message he sent to his investigator. In the message, counsel stated that he was not sure if he would give an opening statement or whether he intended to cross-examine any of the State's witnesses. Counsel stated that the DNA sample "only establishes that [the Petitioner] was probably at the scene . . . within several months, [or] a few years prior to the murder" and that the DNA on the key established that one of seventy million people, including the Petitioner, touched the key. Counsel said that the TBI expert said there was a one in one hundred chance the DNA on the key belonged to the Petitioner. Counsel stated that the testimony about other suspects was "irrelevant" because the police did not have a case against the other people. Counsel said that the "Sorenson [Laboratories] evidence probably doesn't matter because the crime scene evidence was analyzed before CODIS had [the Petitioner's] blood." Counsel stated, "If our argument is simply insufficient evidence there is little, if anything, to gain by cross-examining the State's professional witnesses, and much to lose." Counsel noted that the Petitioner would be "apoplectic" about the strategy.

Trial counsel testified that the Petitioner was upset regarding "just about everything about the case." When asked whether counsel intended to do "anything else" at the trial, counsel said he felt his trial strategy was best.

-9-

Letters from the Petitioner to trial counsel were received as exhibits. In the letters, the Petitioner expressed a desire not to rely on sufficiency of the evidence as a defense and mentioned alternative sources of information, including information about another suspect he obtained from the State's investigator.

On cross-examination, trial counsel agreed that the search warrant at issue in the motion to suppress authorized obtaining a blood sample from the Petitioner and that nothing prevented the trial court from ordering the Petitioner to provide an additional blood sample. Counsel agreed that in one of his letters, he told the Petitioner that if the Petitioner could provide "solid alibi proof," counsel would present an alibi defense. Relative to an alibi, counsel said there was "nothing even so remote as to be worth even mentioning." Counsel recalled filing a motion to suppress a statement the Petitioner made to the TBI while the Petitioner was in prison and said that the statement was "really just awful for the case" and that the State agreed not to present the statement at the trial. Counsel agreed that the Petitioner could have testified and explained why his blood was at the crime scene and said that the Petitioner had admitted the only way the blood could have been there is if the Petitioner had been involved in the crime. Counsel stated that his theory of the case was to challenge the DNA evidence, that he hired Dr. Watson for advice about how best to attack the DNA evidence, and that Dr. Watson found no problems with the TBI's testing procedure. Counsel agreed that Dr. Watson found Sorenson Laboratories and completed the submission form, that counsel assumed Dr. Watson knew which type of test to request, and that counsel relied on Dr. Watson's expertise. Counsel agreed that his trial strategy was not to take the chance that a more sensitive test would yield unfavorable results to the Petitioner. Counsel agreed that because the DNA sample was stored at the TBI laboratory, the State would have known that an independent laboratory was testing the sample and that the State could have subpoenaed the results.

Trial counsel testified that he attempted to suppress the DNA evidence, which he said comprised the State's entire case. Counsel agreed that the prosecutor had an open file policy and said that his investigator examined the entire file. On redirect examination, counsel stated that he did not want to reinforce the State's case by providing a consistent test result.

Dr. William Watson testified that trial counsel hired him as an advisory expert and that although Dr. Watson provided advice about the type of testing to be done on the DNA sample, counsel made the ultimate decision. Dr. Watson said that the test requested was the "Cofiler and Profiler Plus" (Co/Pro) and that he may have completed the submission form. Dr. Watson stated that he was aware a more sensitive test was available and that he recommended the Co/Pro test because it was used by the TBI. Dr. Watson noted that when he wanted to compare genetic profiles generated by different laboratories, he used the same test because different test kits produced profiles involving different portions of the DNA strand. Dr. Watson remembered having a conversation

about whether additional testing was advisable and said his recommendation had been not to retest the sample. Dr. Watson agreed he was concerned that the sample would match the Petitioner, and he said he could not know with certainty what the results would have shown because the sample was not tested. Dr. Watson said that Sorenson Laboratories was only able to extract enough DNA to run the Profiler Plus test, which was one-half of the full Co/Pro test, that the two halves of the test were equally sensitive, and that the sample the TBI sent to Sorenson Laboratories contained less DNA than the sample the TBI tested. Dr. Watson stated that generally, the TBI attempted to preserve half of a DNA sample for retesting and that in this case, less than half remained. Dr. Watson denied that Mr. Walton told him the test performed by Sorenson Laboratories was not the most sensitive test available and that Dr. Watson knew Mr. Walton was going to testify about this fact, although Dr. Watson said that he was aware a more sensitive test existed.

On cross-examination, Dr. Watson testified that he reviewed the TBI's case file, that the TBI followed their standard operating procedure, and that he did not find anything questionable about the testing procedure, although he noted that the TBI had to test the sample multiple times in order to generate a profile. Dr. Watson agreed that he was concerned about a retest yielding an unfavorable result to the Petitioner. Dr. Watson said that he had never had an independent laboratory result contradict a TBI DNA result and that he had previously handled cases in which two independent laboratories' results conflicted. Dr. Watson stated that the results from Sorenson Laboratories only showed that the sample contained male DNA.

The Petitioner testified that his indictment listed the Tennessee Code Annotated section as 39-13-202, which referenced the post-1989 law, and that the Code section should have been 39-2-202, referencing the 1982 version. The Petitioner said that he asked trial counsel to argue this issue, that counsel did not attack the indictment based upon the citation, and that counsel attacked the indictment based upon the lack of a specified mental state. The Petitioner noted that the statute was amended four times between 1989 and 1995 and that in 1985, recklessness was not a codified mental state. He agreed he sent several letters to counsel regarding this issue.

The Petitioner testified that, in his opinion, he was prejudiced by trial counsel's failure to object to the trial court's giving a jury instruction about fingerprints. The Petitioner stated that no pattern jury instruction for fingerprint evidence existed in 1985 and that no fingerprint evidence existed in his case. The Petitioner said that the word "fingerprint" was used more than eighty times at the trial and that counsel requested the fingerprint evidence instruction. The Petitioner stated that he was not aware of counsel's request at the trial.

Relative to trial counsel's opening statement, the Petitioner testified that counsel prejudiced his case by "continuously" referring to the brutal nature of the crime and inflaming the passions of the jury, that the trial court "rebuffed" counsel in the presence

of the jury, that counsel's statement did not include the defense theory, and that counsel did not subject the State's opening statement to "an adversarial challenge." Relative to trial counsel's defense theory, the Petitioner testified that counsel did not try to convince the jury that another person could have committed the offense and that counsel did not mention carpet installers' presence at the victim's business and their access to carpet knives on the day of the murder.

The Petitioner testified that he provided trial counsel with alibi information and that counsel and his investigator did not pursue it. The Petitioner said information in his TBI file showed that he was living in Georgia and traveling between Georgia and Dyersburg at the time of the murder. The Petitioner said that counsel never presented the Sorenson Laboratories report to the jury and that the degraded DNA sample would have cast doubt on the TBI's DNA analysis. The Petitioner acknowledged that Mr. Walton testified about the degraded sample. The Petitioner noted, though, that he believed Mr. Walton's report should have been submitted to the jury, along with the TBI report.

The Petitioner testified that trial counsel should have questioned each person in the chain of custody at Sorenson Laboratories and ordered additional independent testing of the DNA sample in order to determine whether Sorenson Laboratories or the TBI were at fault for the degradation of the sample. The Petitioner said that counsel's decision not to pursue further testing deprived him of knowing whether the sample matched his DNA. The Petitioner noted that the prosecutor mentioned counsel's failure to pursue further testing in his closing argument. The Petitioner said that counsel never discussed his concerns regarding another DNA test and that the Petitioner was under the impression the DNA sample was degraded to the extent that retesting would not yield a different result. The Petitioner stated that counsel told the jury that it was neither the State's nor the defense's fault the sample was degraded.

The Petitioner testified that trial counsel did not have sample 9D tested and that samples 9D and 9A were obtained from the same location. The post-conviction court asked the Petitioner whether he had opposed continuances and whether he was "in a hurry" to have the trial. The Petitioner responded that he had not opposed continuing the case, that he wanted the samples to be tested, and that most continuances were requested in response to the State's failure to provide discovery. The Petitioner said that counsel never told him about the decision not to retest the sample or the reasoning behind it and that the Petitioner learned of the decision just before the trial.

Relative to the search warrant used to obtain the Petitioner's DNA sample, the Petitioner testified that the Lauderdale County Circuit Court and the Tennessee Department of Correction (TDOC) told him that they never received a copy of the warrant. The Petitioner identified a stamped filed copy of the warrant and said that the clerk's office did not have the warrant.

A letter from the Lauderdale County Circuit Court clerk to the Petitioner was received as an exhibit and reflected that the search warrant was not present in the court's records. A letter from the TDOC's general counsel to the Petitioner was received as an exhibit and reflected that the TDOC did not possess any documents relating to the execution of a search warrant against the Petitioner on September 7, 2005.

The Petitioner testified that because the State violated Criminal Procedure Rule 41, the evidence obtained as a result of the search warrant should have been suppressed. The Petitioner said that he was prejudiced by trial counsel's failure to preserve the issue on appeal and that the issue was not heard "in its entirety."

Due to the Petitioner's health concerns, the post-conviction hearing was continued until a later date. When the hearing resumed, the parties agreed that the remainder of the Petitioner's testimony would be submitted to the post-conviction court in a written document. The Petitioner's supplemental testimony, which was received as an exhibit, stated that the Petitioner was prejudiced by trial counsel's failing to challenge the statute cited in the indictment because the Petitioner did not receive notice of which defense he needed to prepare regarding a required mental state. The Petitioner complained that declining to argue the motion to dismiss at a hearing constituted abandoning the motion.

Relative to the motion to suppress the Petitioner's DNA, the Petitioner stated that trial counsel should have cited *United States v. Bennett*, 905 R.2d 931 (6th Cir. 1990), instead of the older case *State v. Little*, 560 S.W.2d 403 (Tenn. 1978). Counsel also cited to contrary case law in the motion. Counsel did not point out to the trial court at the suppression hearing that the TBI agent who wrote the affidavit was reading the case file while he wrote and that nevertheless, the agent wrote the wrong information. The Petitioner said that counsel waived the most important issue in the case by not including it in the motion for a new trial and that counsel failed to investigate and notify the trial court that the search warrant was not filed with the Lauderdale or Dyer County court clerks or left with the Petitioner or the TDOC, which would have triggered the necessity of a Rule 41 dismissal. The Petitioner said that contrary to his wishes, counsel failed to file an interlocutory appeal when the motion to suppress was denied.

Relative to trial counsel's failure to retest the DNA samples, the Petitioner stated that counsel did not request a continuance to allow retesting. The Petitioner said that he was deprived of knowing "the true nature of the DNA and the TBI test result" and whether retesting would have yielded exculpatory information. The Petitioner stated that retesting was the only way to subject the State's evidence to a meaningful adversarial challenge. The Petitioner noted that the TBI's DNA expert testified at the suppression hearing that he would retest the sample to confirm the result. Counsel also did not retest any of the other samples found at the crime scene, including one located on the same counter as sample 9A, bloody handprints, and bloody footprints.

Relative to an alibi, the Petitioner stated that trial counsel did not investigate the Petitioner's former employers, who were listed in the TBI's investigative file. Relative to counsel's theory of the case, the Petitioner said that counsel did not interview the appropriate witnesses before the trial in order to develop alternative suspects or place blame for the degraded condition of the DNA sample. The Petitioner stated that counsel did not raise the issue of whether a theft occurred.

Relative to the fingerprint instruction, the Petitioner stated that the trial court "falsely stated" fingerprint evidence existed, that trial counsel should have asked the court to instruct the jury that the Petitioner's fingerprints did not match the fingerprints found at the scene, and that counsel should have requested the court to instruct the jury to disregard the fingerprint evidence. The Petitioner said that the fingerprint evidence instruction confused the jury and falsely bolstered the State's case and that counsel should have told the jury no match existed to the fingerprints collected at the crime scene.

Relative to trial counsel's opening statement, the Petitioner stated that counsel did not tell the jury that other people could have committed the crime or that the Petitioner was innocent. The Petitioner said that counsel did not cast doubt on the TBI test result in light of the Sorenson Laboratories test result and that counsel pressured the jury to resolve the case because he mentioned a delay in obtaining justice for the victim.

The Petitioner testified that trial counsel consented to the stipulations without notifying him, that the Petitioner found out about the stipulations when he examined the appellate record, and that the stipulations included DNA sample 9A, the keys, and twenty-nine photographs of fingerprinted items. The Petitioner said that the stipulation form did not reflect a line for the Petitioner's signature, that counsel or the trial court should have questioned the Petitioner on the record to ensure he knew about the stipulations, and that as a result of the stipulations, the evidence was received as "facts of proof."

The trial transcript, which was received as an exhibit, reflected that during opening arguments, trial counsel stated the following:

> [T]his is a tough case. This is brutal. It's just a horrible, disgusting crime, there's no question about that . . . . The only question in this case is who did it? . . . [t]he proof will show that this crime . . . [has] been unsolved for twenty-five years and it's still unsolved.

Counsel discussed that the DNA evidence obtained from the scene matched the Petitioner's DNA, Sorenson Laboratories' contrary results, and the keys before the trial court interrupted and admonished counsel because his argument was "more in the form of a closing argument." Counsel examined TBI Agent Johnson, Mr. Walton, and Mr. Van Sant, the serologist who analyzed the blood samples in 1985, about the testing performed

on the samples, what caused a sample to degrade, and whether the degradation of sample 9A was expected. Mr. Walton testified that degradation of a properly stored DNA sample between 2005 and 2009 would surprise him and that it was possible for the amount of DNA to be distributed unevenly throughout the thread on which it was collected.

Agent Johnson testified at the trial relative to DNA sample 9A that eleven loci and a sex marker had been matched to the Petitioner, that another suspect had been excluded as a contributor, and that generally, a match of nine loci was considered conclusive. Relative to the keys, four loci and a sex marker were matched to the Petitioner. Agent Johnson stated that although the Petitioner was not excluded as a contributor, he could not determine with certainty that the sample matched the Petitioner's DNA. Mr. Walton stated that the sample had degraded by the time Sorenson Laboratories tested it and that a more sensitive DNA test existed, although it had not been requested.

Relative to the jury instruction on fingerprint evidence, the trial transcript reflects the following exchange:

THE COURT: . . . . [Trial counsel has] also mentioned something about a fingerprint charge. I have that fingerprint charge. I'm not sure it's really applicable. Do you want to come look at it to see? Have you seen it, Mr. Bivens?

MR. BIVENS: Yes, sir.

THE COURT: Is that gonna be applicable with –

[COUNSEL]: Well, because fingerprint evidence has been – has been presented.

THE COURT: Okay.

[COUNSEL]: And it may be considered in determining.

The trial court gave the following jury instruction:

Fingerprint evidence has been presented in this case. You may consider this evidence in determining the defendant's identity as the person who committed this crime. Fingerprint evidence is circumstantial evidence . . . . There are no two sets of fingerprints exactly alike . . . . The weight to be accorded fingerprint evidence is a question for the jury to decide in light of all the surrounding facts and circumstances of the case.

-15-

During closing arguments, trial counsel and the prosecutor stated that no fingerprints matched the Petitioner. Counsel called the fingerprint evidence the "most important evidence" in the case. Counsel discussed the mistakes in the search warrant affidavit as an example of how the State confused the DNA samples. The prosecutor stated that although more sensitive DNA testing existed, the Petitioner had not had the sample retested.

On appeal, this court concluded relative to the indictment issue that no error existed and that no culpable mental state was required for felony murder in 1985. *See Harold Bernard Shaffer*, 2012 WL 3792034 at *6. Relative to the search warrant, this court determined that the issue was waived because it was not raised in the motion for a new trial. *Id*. at *8. This court considered the issue for plain error and concluded that the location of the drop of blood was not essential to the probable cause determination. *Id.* at *9.

Relative to the indictment and the search warrant, the post-conviction court found that the issues were previously determined. Relative to trial counsel's failing to retest the DNA, the court found that counsel and the defense expert decided further testing might produce a result prejudicial to the Petitioner and that they concluded the best defense was to challenge the reliability of the degraded DNA evidence. Relative to counsel's investigation of an alibi, the court found that the Petitioner presented no alibi witnesses and that counsel testified he had not found any alibi witnesses.

The post-conviction court determined that trial counsel had not provided ineffective assistance regarding his duty to investigate the case. The court found that counsel had investigated alibi information and did "everything possible to attack the reliability of the DNA evidence" and that "[this] procedure was the only effective defense that could be raised."

Relative to trial counsel's opening statement, the post-conviction court determined that no ineffective assistance occurred, that the trial court did not admonish counsel for his characterization of the crime but that counsel "was admonished that he was making a closing statement because he was going further than the trial court felt he should." Relative to the contention that "counsel was ineffective . . . by not [requesting]" an instruction on fingerprint evidence, the post-conviction court found that "there was no basis for giving such an instruction on fingerprint evidence[.]" Relative to the stipulations, the court found that "nothing . . . required the petitioner to consent to the stipulations, but he did so. There was also a basis for the stipulation, which benefitted petitioner." The court found that counsel's decision was tactical. The court denied relief. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of

Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

# I

## Indictment

The Petitioner contends that the post-conviction court erred by concluding that the issue regarding a lack of a stated mens rea in the indictment had been previously

-17-

determined. Although the Petitioner's issue regarding the indictment is framed in the context of the ineffective assistance of counsel, post-conviction counsel does not complain of any actions taken by trial counsel, arguing only that the indictment was defective for failure to allege a mental state. In any event, we agree with the State and conclude that this court fully considered the validity of the indictment in the previous appeal and that the indictment was previously determined to be valid.[1]

In the appeal of the Petitioner's conviction, this court stated the following:

> The Defendant contends that this indictment is fatally flawed because it contains no allegation of the culpable mens rea element. We disagree.
>
> In 1985, the offense of first degree felony murder was defined as follows: "Every murder . . . committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." Tenn. Code Ann. § 39–2–202(a) (1982). This Court repeatedly has recognized that the crime of felony murder as defined in 1985 did not contain a mens rea element . . . . Accordingly, the Defendant is entitled to no relief on this issue.

*Harold Bernard Schaffer*, 2012 WL 3792034 at *6.

Because no error existed in the indictment, the Petitioner has failed to prove that counsel's actions resulted in prejudice. Counsel did not provide ineffective assistance by not challenging the indictment in this regard, and the Petitioner is not entitled to relief on this basis.

## II

### Search Warrant

The Petitioner contends that trial counsel provided ineffective assistance by failing to (1) preserve the suppression issue for appeal and (2) investigate and challenge the warrant pursuant to Tennessee Rule of Criminal Procedure 41, which states that a motion to suppress pursuant to Rule 12(b) must be granted when a copy of a warrant is not left with a defendant and filed with the court clerk. The State contends that Petitioner failed to establish prejudice.

---

[1] We note that counsel raised this issue in his January 2007 motion to dismiss. Counsel did not fail to challenge the indictment or to raise the lack of an enumerated mental state.

The record reflects that the post-conviction court did not make findings of fact specific to this issue. The court's failure to comply with the statutory directive to make findings of fact frustrates appellate review. *See* T.C.A. 40-30-111(b) (2014). However, "the failure of the trial judge to abide by the requirement [to make findings of fact] does not always mandate a reversal[.]" *State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). The post-conviction court stated in its order its reasoning for denying the petition, including that "defense counsel did everything possible to attack the reliability of the DNA evidence," indicating that the court was unconvinced the Petitioner was prejudiced. The record includes the post-conviction hearing and trial transcripts, which are sufficient to "effectuate meaningful appellate review" of this issue. *Id*.

*a. Appeal*

Trial counsel's failure to include the suppression issue in the motion for a new trial, informed by his mistaken belief that the issue was not a "trial issue," was deficient performance. However, the record does not preponderate against the post-conviction court's finding that the Petitioner failed to establish prejudice.

In the appeal of the Petitioner's conviction, this court concluded that the suppression issue had been waived because it had not been raised in the motion for a new trial. *Id*. at *8. Nonetheless, this court examined the issue for plain error and concluded that because the location of the matching DNA sample was not essential to establishing probable cause, no clear and unequivocal rule of law had been breached. *Id*. at *9. The Petitioner failed to show that trial counsel's failure to preserve the issue for appeal resulted in prejudice. The Petitioner is not entitled to relief on this basis.

*b. Rule 41*

At the post-conviction hearing, trial counsel testified that he knew the procedural requirements in Tennessee Criminal Procedure Rule 41, specifically that copies of a search warrant must be filed with the court clerk and given to the subject of the search. However, counsel also testified he was not aware that the fruits of a search warrant could be suppressed for noncompliance with Rule 41. Letters from the Lauderdale and Dyer County court clerks and the TDOC stating that they did not possess a copy of the search warrant were received as exhibits.

Rule 41(g) states the following:

**(g) Motion for Return or Suppression of Property.** A person aggrieved by an unlawful or invalid search or seizure may move the court pursuant to Rule 12(b) to suppress any evidence obtained in the unlawful search or seizure . . . . The motion shall be granted . . . if the evidence in support of the motion shows that:

. . . .

> (6) the serving officer—where possible—did not leave a copy of the warrant with the person or persons on whom the search warrant was served.

The Petitioner has failed to prove prejudice. The Petitioner has offered no proof that the State would have been impeded from seeking another warrant and obtaining another DNA sample in compliance with Rule 41(g).

Relative to the search warrant not being filed with the court clerk, the Petitioner has not offered proof that a challenge to the warrant would have succeeded. The requirement for a magistrate to transmit an executed warrant to the court clerk is contained in Rule 41(f)(2). Our case law suggests that procedural errors not included in Rule 41(g) do not result in suppression of the evidence. *See State v. Hilliard*, 906 S.W.2d 466, 468 (Tenn. Crim. App. 1995) (holding that suppression of evidence was not necessary when the search warrant was never returned to the issuing magistrate as required in Rule 41(d)); *see also Anderson v. State*, 512 S.W.2d 665, 668 (Tenn. Crim. App. 1974) ("[T]he return of an officer upon a search warrant is a ministerial function and does not affect the validity of the warrant and its execution by the officer."), *perm. app. denied* (Tenn. Jun. 3, 1974). Likewise, subsection (g) does not include failing to file the returned warrant with the court clerk. The Petitioner is not entitled to relief on this basis.

### III

### Retesting DNA Sample

The Petitioner contends that trial counsel provided ineffective assistance by abandoning his motion to retest the DNA samples using a more thorough test. He argues that further testing might have yielded an exculpatory result. The State responds that the post-conviction court correctly found that the decision to forego additional testing was tactical.

Trial counsel and Dr. Watson testified that the decision not to pursue additional testing was based upon Dr. Watson's concern that further testing would confirm the State's initial results. Counsel's decision was tactical, informed, based upon adequate investigation, and made in consultation with his retained expert. The evidence does not preponderate against the post-conviction court's finding.

In addition, we cannot speculate as to the exculpatory or inculpatory nature of testing that was never performed and not presented at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The Petitioner is not entitled to relief on this basis.

## IV

## Alibi Investigation

The Petitioner contends that trial counsel provided ineffective assistance by failing to investigate any possible alibi witnesses in Georgia. The State responds that the post-conviction court correctly credited counsel's testimony that he investigated all alibi information given to him.

We note that the Petitioner did not identify a potential alibi witness or present an alibi witness at the post-conviction hearing. Although the Petitioner references in his brief that "employers" were listed in the TBI file, the TBI file was not an exhibit to the hearing and is not part of the appellate record. We cannot speculate as to the existence or potential testimony of unknown alibi witnesses. *See id.*, 794 S.W.2d at 757. Trial counsel testified that he investigated all alibi information provided by the Petitioner and his parents. The post-conviction court found that counsel had fully investigated potential alibis, and counsel's correspondence with the Petitioner and statements at a pretrial hearing requesting funding for an investigator were consistent with his testimony. The evidence does not preponderate against the court's finding. The Petitioner is not entitled to relief on this basis.

## V

## Defense Theory

The Petitioner contends that trial counsel provided ineffective assistance by failing to develop a "workable theory of the case." He reasons a defense theory "that the evidence did not show that [the Petitioner] was guilty beyond a reasonable doubt" is "the ultimate non-theory." The State responds that the Petitioner offered no proof to support his claim.

The post-conviction court determined that trial counsel had investigated alibi information and did "everything possible to attack the reliability of the DNA evidence" and that "[t]his procedure was the only effective defense that could be raised."

Upon review of the record, including the trial transcript, the evidence does not preponderate against the post-conviction court's findings. Trial counsel cross-examined witnesses about the degradation of the DNA sample and the unreliability of serology practices in the 1980s. Counsel elicited testimony from the Sorenson Laboratories expert that the expert would have been surprised if a sample had degraded in four years' time. In counsel's closing argument, he questioned why, if all the samples had been collected on the same day, usable DNA was found in sample 9A but not in the remaining samples. Counsel also discussed alternative suspects.

Although trial counsel had articulated a minimalist trial strategy in his email to his investigator, the trial transcript reflects that counsel cross-examined witnesses and gave an opening statement to challenge the DNA evidence. In any event, counsel's approach at trial was tactical. In the absence of an alibi or evidence linking other suspects to the crime scene, counsel's theory of the case was not unreasonable. In addition, the reasonableness of counsel's challenge to the sufficiency of the evidence was further illustrated by this court's characterization of the proof as "not overwhelming." The evidence does not preponderate against the post-conviction court's finding that counsel's performance was not deficient. The Petitioner is not entitled to relief on this basis.

## VI

## Opening Statement

The Petitioner contends that trial counsel provided ineffective assistance by using inflammatory language in his opening statement. The State responds that the evidence supports the post-conviction court's determination that counsel's statement was not ineffective. We agree with the State.

The post-conviction court found that although the trial court admonished trial counsel during his opening argument, the court referred to the scope of counsel's argument rather than counsel's discussion of the gruesome nature of the crime. The trial transcript is consistent with the post-conviction court's determination. The trial court interjected after counsel began reciting details of the anticipated witness testimony and of particular pieces of evidence, not during counsel's characterization of the crime. Further, the Petitioner has not offered any proof that counsel's remarks influenced any of the jurors. The Petitioner is not entitled to relief on this basis.

## VII

## Fingerprint Instruction

The Petitioner contends that trial counsel provided ineffective assistance by failing to object to the jury instruction regarding fingerprints. He argues that no such evidence existed "against the Defendant." The State responds that the evidence does not preponderate against the post-conviction court's finding that counsel was not ineffective "in failing to have the Court . . . [provide] a T.P.I. instruction in fingerprint evidence."

The post-conviction court found that "there was no basis for giving such an instruction on fingerprint evidence[.]" We acknowledge that the Petitioner raised many issues in his post-conviction petition and at the hearing and that at times, his arguments were difficult to follow. However, contrary to the post-conviction court's finding, the Petitioner's issue was not that trial counsel *should have* requested a fingerprint

instruction, but rather that counsel "failed to object to a jury instruction on fingerprint evidence."

The Petitioner correctly notes that no fingerprints at the crime scene matched the Petitioner's fingerprints. However, the trial transcript reflects that trial counsel requested the instruction due to the testimony about collecting bloody fingerprints, palm prints, and shoeprints at the scene. Counsel stated that the fingerprint evidence might have some impact on the jury's deliberations. Counsel's decision was tactical, and his performance was not deficient.

In any event, the Petitioner has not offered any proof in support of his claim that the instruction "falsely bolstered" the State's evidence or implied that the collected fingerprints matched the Petitioner. The trial transcript reflects that during closing arguments, trial counsel discussed the fingerprints as the "most important evidence" in the case and that counsel emphasized the lack of a fingerprint match to the Petitioner. In addition, the prosecutor acknowledged during his argument that no fingerprint evidence linked the Petitioner to the offense. We note that the instruction was a correct statement of the law, and that if, as the Petitioner testified, fingerprints were mentioned eighty times during the trial and photographs of fingerprints were introduced as evidence, a general fingerprint instruction was appropriate. The Petitioner has not proven that he suffered prejudice, and he is not entitled to relief on this basis.

## VIII

### Stipulations

The Petitioner contends that trial counsel provided ineffective assistance by entering into stipulations with the State without the Petitioner's consent. The State responds without elaboration that the Petitioner did not prove counsel provided ineffective assistance.

The post-conviction court's finding that the Petitioner consented to the stipulations is not supported by the record. At the post-conviction hearing, trial counsel testified that although he did not recall the stipulations, he assumed the stipulation form entered into evidence was accurate. Counsel was not asked whether the Petitioner consented to the stipulations. The Petitioner testified that counsel did not consult him before entering into the stipulations and that he did not know about them until he received the appellate record. The stipulations pertained to the admissibility of several pieces of evidence, including the autopsy report, DNA sample 9A, the keys, the victim's and the Petitioner's blood samples, and the photographs of the fingerprints. Even assuming the court discredited the Petitioner's testimony, the record does not support the conclusion that the Petitioner affirmatively consented to the stipulations.

In any event, trial counsel's entering into the stipulations was tactical, and the Petitioner has not established prejudice. The Petitioner's statement in his brief that counsel's "failure to communicate with the Defendant is tantamount to ineffective assistance of counsel and was prejudicial" is conclusory and presented without application to the facts of the case. In his supplemental testimony, the Petitioner stated that the stipulations were prejudicial because they were received as "facts of proof" before the jury and that the Petitioner did not know to which facts he stipulated.

Upon review of the stipulations, the parties agreed only that the evidence was admissible. The admissibility of the autopsy report, the photographs and evidence from the crime scene, and the victim's blood was not reasonably in dispute. Trial counsel unsuccessfully sought to suppress the Defendant's blood sample before the trial, and as a result, it was not necessary to argue the issue again. Counsel noted that stipulating to the admissibility of evidence not in dispute was often advantageous for defendants. Even if counsel did not consult the Petitioner before entering into the stipulations, the Petitioner has presented no example of how the decision affected the outcome of the trial, and he is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE